[No. B053699. Second Dist., Div. Five. Dec. 18, 1992.]

JOSEPH STELL et al., Plaintiffs and Appellants, v.
JAY HALES DEVELOPMENT CO. et al., Defendants and Respondents.

1218

**COUNSEL**

Bryan, Cave, McPheeters & McRoberts, Todd M. Sloan, Shapiro, Posell & Close, Jonathan J. Panzer and John D. Arya for Plaintiffs and Appellants.

Reed & Brown, Stephen W. Reed and James A. Gorton for Defendants and Respondents.

## OPINION

**BOREN, Acting P. J.—**

### INTRODUCTION

Alleging that respondents were constructing a house in violation of covenants, conditions and restrictions, and also in violation of local zoning ordinances, appellants filed a complaint sounding in nuisance and requesting injunctive relief to abate the nuisance, declaratory relief and damages. The trial court denied appellants' request for a jury trial and, at the conclusion of appellants' presentation of evidence, granted respondents' motions for judgment pursuant to Code of Civil Procedure section 631.8 and for nonsuit. On appeal, appellants contend that the trial court erred in denying trial by jury and in rendering judgment on the grounds that appellants failed to prove the construction constituted a nuisance. Appellants also contend that the trial court was without jurisdiction to award expert witness fees pursuant to Code of Civil Procedure section 998 and that the trial court erred in awarding sanctions against appellants.

### STATEMENT OF FACTS

In 1946, R. P. Harper and his wife, who were doing business as Preston Enterprises (collectively, Preston), subdivided a tract of land in what is now the City of La Canada-Flintridge (the city). In conjunction with that subdivision, Preston recorded a "Declaration of Establishment of Conditions and Restrictions" (CC&R's) on March 21, 1946. Among other things, these CC&R's specified that each lot in the subdivision could be used "only to erect and maintain thereon a single private house or a residence" and could be "occupied for use by not more than one family." The CC&R's also specified that any house erected on a lot would be "limited to one story in height." Preston had conveyed on December 8, 1945, lots 10, 11, and 12 to Bernice Baymiller (Baymiller) by a grant deed, which was recorded on April 13, 1946. This deed did not recite the CC&R's, made no reference to them, and was apparently the first conveyance by Preston. Lot 12 is the subject of appellants' complaint.

Appellants are the owners of neighboring parcels in the Preston tract. Appellants Joseph Stell and his wife own lot 13, and appellants Robert and

Ellamae Johnson own lot 11, which are the lots immediately adjacent to lot 12. Appellant Joseph Stell is an attorney.[1]

Lots 10, 11, 12, and 13 front on Georgian Road, and each lot was cut approximately in half by a county flood control easement, which at some later point was converted into a concrete flood control channel. In 1960, Baymiller and her husband subdivided lot 12, so that the front half of lot 12, upon which Baymiller's house had been constructed, was designated as 356 Georgian Road and the second lot, most of which was to the rear and on the back side of the flood control channel, was designated as 344 Georgian Road. The latter parcel is the site of the construction to which appellants objected, and is essentially a flag lot with access from Georgian Road by a long driveway along one side of the 356 Georgian Road parcel. After some intervening transactions, the two parcels were conveyed in the mid-1960's to Max Herman, since deceased, and his wife, respondent Betty Herman. In 1986, the Max and Betty Herman revocable living trust (the Trust) was created and became the legal owner of both parcels of lot 12. In 1989, the Trust conveyed the rear parcel, 344 Georgian Road, to respondent Jay Hales Development Co. (Hales), which was owned by respondent Jay Hales.

On May 24, 1989, the city, which had been incorporated in 1976, issued a certificate of compliance which certified that 344 Georgian Road, the rear parcel, complied "with all applicable provisions of the Subdivision Map Act and the city's subdivision ordinance." This certificate was recorded on June 14, 1989. In accordance with applicable permits issued by the city, Hales commenced construction on the property in June 1989. In late July or early August, several of appellants made inquiries and investigations, and learned that the activity on the rear parcel was the construction of a two-story house. Appellants filed their complaint on September 28, 1989, by which time Hales had covered the flood control channel to provide vehicle access to the rear parcel and had made substantial progress toward completion of the house.

## DISCUSSION

### I. *Jury Trial*

Appellants contend that the trial court erred in granting respondents' motion *in limine* to have trial without a jury. We find no error.

 A jury trial is not a matter of right when an action is one in equity. In making a determination of whether an action is triable by jury,

---

[1]At trial, appellant Stell represented himself in propria persona and all other plaintiffs. Certain plaintiffs withdrew prior to trial, and others consulted other counsel prior to the posttrial sanctions hearing.

" ' "the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the *gist* of the action. . . ." ' [Citation.] . . . [I]f the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial. [Citations.] Although we have said that 'the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded' (*Raedeke* v. *Gibraltar Sav. & Loan Assn.* [1974] 10 Cal.3d 665, 672 [111 Cal.Rptr. 693, 517 P.2d 1157]), the prayer for relief in a particular case is not conclusive [citations]. Thus, '[t]he fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury . . . .' [Citation.]" (*C&K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 9 [151 Cal.Rptr. 323, 587 P.2d 1136].)

■ In determining that appellants were not entitled to a jury trial, the trial court relied upon the case of *Wolford* v. *Thomas* (1987) 190 Cal.App.3d 347 [235 Cal.Rptr. 422]. We agree with the trial court that *Wolford* is dispositive of the question of whether or not a jury trial was warranted in the instant case. As the Court of Appeal stated in *Wolford,* "[T]he gist of the . . . complaint was clearly to abate a public and private nuisance and for injunctive and declaratory relief. . . . Furthermore, the bulk of the relief sought here, under . . . nuisance . . . claims, was equitable. . . . The fact that the . . . complaint also sought 'damages . . .' does not convert this essentially equitable action into a legal one. It was infeasible for the court to sever the legal claim from the equitable one here. Moreover, the damage claims were incidental to the equitable claims. If the [plaintiffs] were to prevail and damages were awarded, it would be primarily on a basis of the court fashioning a remedy other than demolishing the [house]. ■ One of the aspects of an equitable action is the balancing of the interests of the parties. To do equity a trial court must have various options available to it, including that of awarding damages. In sum, the trial court's action of granting the . . . motion for court trial was correct. The [plaintiffs] were not entitled to a jury trial on their claims." (*Id.* at pp. 353-354.) For the same reasons, neither were appellants here.

II. *Nuisance*

Appellants contend that the trial court erred in finding that appellants had failed to prove a nuisance based on violation of local zoning ordinances. We disagree.

It is not disputed that the area in which lot 12 of the tract was located was zoned by local ordinance as "R-1-40,000" and that zoning regulations

prohibited more than one single-family residence on any parcel and required that any such parcel be at least 40,000 square feet in area. Appellants claim that respondents were in violation of the zoning ordinance in both of its respects: first, that 344 Georgian Road, the rear parcel of lot 12, was less than 40,000 square feet in area, and, second, that a second dwelling could not be constructed on lot 12 because it had been illegally subdivided and, by operation of law, the two parcels had merged.

■ Preliminarily, we note that the law permits a private individual to enjoin a zoning violation as a nuisance if the private individual has suffered a " 'special injury to himself in person or property of a character different in kind from that suffered by the general public' [citation] or an injury 'greater than that suffered by the public generally' [citation] . . . ." (*Pacifica Homeowners' Assn.* v. *Wesley Palms Retirement Community*) (1986) 178 Cal.App.3d 1147, 1152-1153 [224 Cal.Rptr. 380]; see also *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 939-940 [101 Cal.Rptr. 568, 496 P.2d 480].) The trial court found that appellants had failed to present any evidence that the rear parcel of lot 12, 344 Georgian Road, contained an area of less than 40,000 square feet. The trial court also found that there was no evidence either that the 1960 subdivision of lot 12 was illegal or that the two parcels of lot 12 had merged by operation of law.

### A. Evidence of Parcel Size

■ Recognizing that no witness testified about the actual size of either lot 12 or 344 Georgian Road, the rear parcel, appellants urge nonetheless that the trial court had sufficient evidence before it from which to calculate the size of the rear parcel. Appellants urge that the trial court had this capability because of two documents that were in evidence. The first document is the 1946 subdivision tract map of tract 13397, which gives the dimensions of lot 12. The second document is the certificate of compliance issued by the city, which certifies that 344 Georgian Road is in compliance with subdivision laws and states the legal description of that parcel of lot 12. Respondents stipulated to both of these documents in the joint issues conference statement prior to trial. We do not find that these two documents present substantial evidence of the area of either lot 12 or the rear parcel. Nor do we believe that it is incumbent upon the trial court or this court to step into the shoes of an expert witness in an attempt to calculate the area in square feet. While it may be within the capability of the trial court to compute square footage by a simple mathematical formula where a lot in question is rectangular or square in shape, such is hardly reasonable when the lot has curved sides and oblique angles.

Lot 12's frontage on Georgian Road is semicircular, and the lot has in fact five sides, including one rather obviously oblique angle located at the corner

of what the legal description in the certificate of compliance describes as the "true point of beginning." It may well be that all the corners of the rear parcel of lot 12 are 90-degree angles, but we have been cited to no evidence in the record that proves that fact. Thus, the trial court, and this court, would have to resort to speculation in order to compute the area of the rear parcel. Indeed, as appellants admit, they provided the trial court with one figure and have now provided this court with another figure. An expert could have readily provided such information to the trial court. We decline to burden the trial court with the duty to make such computations, as appellants now urge.[2]

## B. *Evidence of Subdivision and Merger*

Appellants also contend that lot 12 was not lawfully subdivided in 1960, and that, by operation of law, the two parcels comprising that lot were merged. As a result, they claim, Hales, in concert with the remaining defendants, violated the zoning ordinance prohibiting more than one house on a lot within the "R-1-40,000" zone.

### 1. *Subdivision*

The Baymillers subdivided lot 12 in the following manner: in 1960, the Baymillers conveyed the front portion of the property (i.e., 356 Georgian Road) to Clyde and Edna Bowles by grant deed, retaining title to the rear portion of the lot (i.e., 344 Georgian Road). Approximately nine months later, in 1961, the Bowles leased the front parcel back to the Baymillers.[3] In 1962, the Bowles executed a grant deed and lease assignment to Kent and Francine Steinbrenner, conveying to them all of their interest in the front parcel of lot 12. In August 1964, the Steinbrenners executed a grant deed conveying 356 Georgian Road to the Hermans. In late December of the same year, the Baymillers conveyed the rear parcel to the Hermans, as well, by a

---

[2]The size of the parcel was essential to appellants' claim that respondents were in violation of the zoning ordinance. Therefore, the burden to prove this fact lay with appellants. (Evid. Code, § 500; 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 133, p. 117.)

Even if appellants had proven the zoning violation, it is not clear that a nuisance would have been proven. A review of nuisance cases relating to zoning violations generally shows that these cases also involve discharge of noxious substances or foul odors, emission of dust or smoke, generation of vibrations, land or mud slides or loss of lateral support. In final analysis, a court must weigh the utility of the defendant's conduct against the gravity of harm. (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 123, p. 804.)

[3]The terms of the lease suggest that the sale/leaseback was a strawman transaction. Under the lease terms the Baymillers were given a 50-year leasehold with a right to repurchase for $1.

grant deed transaction. At the same time, the Baymillers released their leasehold interest in the front parcel by executing a quitclaim deed.[4]

In 1960, when the Baymillers partitioned their lot by means of the conveyance of the front parcel to the Bowles, the Subdivision Map Act of California was part of the Business and Professions Code. Former section 11525 of that code vested "[c]ontrol of the design and improvement of subdivisions . . . in the governing bodies of cities and of counties" subject to superior court review as to reasonableness. Divisions of land in which only four or less parcels were created were not covered by the Subdivision Map Act since former section 11535 defined subdivisions as those divisions of land where the subdivider created "five or more parcels within any one-year period." However, divisions of land such as the one at issue in this case still could be regulated by local ordinance. (See Bus. & Prof. Code, former § 11540.1 as enacted by Stats. 1949, ch. 1100, § 1, p. 2001.[5])

Appellants contend that the Baymillers' 1960 subdivision of lot 12 was illegal because the Baymillers did not comply with Los Angeles County Ordinance No. 4478, as amended in 1958.[6] Appellants claim that this ordinance required the Baymillers to file a parcel map and that the Baymillers failed to do so. No evidence was presented at trial that there was any such parcel map, and respondents do not claim that there was one. However, we agree with respondents that the ordinance does not purport to regulate a division of land which creates only two parcels. Section 7, subdivision (a), of Ordinance No. 4478 prohibited the sale or lease of "any subdivision or any part thereof . . . until a final map thereof, or approved record of survey map thereof . . . has been duly recorded or filed . . . ." Section 20 of the ordinance defined "subdivision" as any real property which is divided "into five or more parcels within any one year period . . . ." Thus, the ordinance did not purport to govern the Baymillers' 1960 division of lot 12.

### 2. Merger

Nor do we agree that the land merged by operation of law when the Hermans became the owners of both of the contiguous parcels in 1964. At

---

[4]These transactions were evidenced at trial by stipulation of counsel in the joint issues conference statement.

[5]Business and Professions Code former section 11540.1 provided, in pertinent part: "Nothing in this chapter prevents the governing body of any municipality or county from regulating the division of land which is not a subdivision . . . ."

[6]Although appellant Stell in argument discussed this ordinance with the trial court, he did not request the trial court take judicial notice of it. He urges that we take judicial notice of it since it was requested for judicial notice with respect to respondents' demurrers prior to trial. This activity, however, was before a different trial judge. Nonetheless, since respondents also discuss this ordinance and as its terms seem to be undisputed, we take judicial notice of it as presented in the clerk's transcript pursuant to Evidence Code sections 452, 458, and 459.

the time the Hermans became the owners of both parcels, no statute or local ordinance provided for merger. Subsequently, in 1976, the Legislature amended the Subdivision Map Act to provide for merger, subject to certain conditions, of "contiguous parcels . . . held by the same owner" where one of the parcels did "not conform to standards for minimum parcel size." (Gov. Code, former § 66424.2, as added in 1976.) However, this provision required local agencies to file and record notices to the owner(s), and to provide a right of hearing, in order to effectuate such a merger.[7] Appellants presented no evidence that the County of Los Angeles or the City of La Canada-Flintridge ever took any action to effectuate a merger of the two parcels of lot 12.

In addition to citing Government Code section 66424.2, appellants also cite an ordinance of the City of La Canada-Flintridge (cited as "La Canada-Flintridge Ordinance 101, section 11.20.010(b)(2)").[8] As characterized by appellants, the La Canada-Flintridge ordinance "permits merger of contiguous lots held by the same owner if one of the two parcels is not developed and was 'not created in compliance with applicable laws and ordinances in effect at the time of its creation.' " While that ordinance may "permit" merger, it does not indicate an intent on the part of the city to bypass the

---

[7]As amended in 1977, section 66424.2 read as follows: "Notwithstanding Section 66424, two or more contiguous parcels or units of land which have been created under the provisions of this division or any prior law regulating the division of land or a local ordinance enacted pursuant thereto or were not subject to such provisions at the time of their creation shall not merge by virtue of the fact that such contiguous parcels or units are held by the same owner and no further proceeding under the provisions of this division or a local ordinance enacted pursuant thereto shall be required for the purpose of sale, lease or financing of such contiguous parcels or units, or any of them; except that, a local agency may, by ordinance, provide that if any one of such contiguous parcels or units held by the same owner does not conform to standards for minimum parcel size to permit use or development under a zoning, subdivision or other ordinance of the local agency and at least one of such contiguous parcels or units is not developed with a building for which a permit has been issued by the local agency, or which was built prior to the time such permits were required by the local agency then such parcels shall be merged for the purposes of this division. [¶] A local agency may, by ordinance, deem any or all parcels or units of land which merged prior to the effective date of the 1977 amendments to this section, unmerged and separate parcels. [¶] Whenever a local agency has knowledge that real property has merged pursuant to this section of a local ordinance enacted pursuant to this section, it shall cause to be filed for record with the recorder of the county in which the real property is located, a notice of such merger specifying the names of the record owners and particularly describing the real property, provided that, at least 30 days prior to the recording of the notice the owner of the parcels or units to be affected by the merger, shall be advised in writing of the intention to record the notice and specifying a time, date and place at which the owner may present evidence to the legislative body or advisory agency why such notice should not be recorded."

[8]Appellants once again fail to cite to the record on appeal and do not specify how and when this authority was cited to the trial court. We assume that Ordinance No. 101 is the same as "Ordinance No. 11," which was admitted into evidence as exhibit 9. Since respondents do not dispute the La Canada ordinance, we will accept appellant's characterization of it.

notice and hearing provisions of California's Subdivision Map Act concerning merger. Appellants cite no other authority for the proposition that lot 12 "was merged into a unitary parcel by operation of law in 1965 [*sic*]."

### 3. *"Unmerger"*

In the 1980's, the Legislature apparently recognized the uncertainty created by the earlier merger statutes and revised the Subdivision Map Act to clarify and "unmerge" contiguous parcels where local agencies had not elected to pursue the notice and hearing option previously provided by the Act. Section 66451.30 of the Government Code, enacted in 1983, provides that any "parcels . . . of land for which a notice of merger had not been recorded on or before January 1, 1984, shall be deemed not to have merged" if the parcel met certain criteria as of January 1, 1984.[9] These revisions also specified the procedures by which local agencies could provide for merger of contiguous parcels. The Legislature again required notice, hearing and recordation before a merger could be effectuated. (See Gov. Code, §§ 66451.10-66451.16.)[10]

Government Code section 66451.30 provided that contiguous parcels would be deemed not to have merged if they had been created in compliance with applicable laws and ordinances in effect at the time they were created. (Gov. Code, § 66451.30, subd. (a)(2).)

Appellants failed to show lot 12 was illegally subdivided. Even if we assume for purposes of analysis that lot 12 was illegally subdivided, section 66451.19, subdivision (a), of the Government Code provides that "a city or county shall no later than January 1, 1986, record a notice of merger for any parcel merged prior to January 1, 1984. After January 1, 1986, no parcel merged prior to January 1, 1984, shall be considered merged unless a notice of merger has been recorded prior to January 1, 1986." Inasmuch as there

---

[9]Government Code section 66451.30 provides, in pertinent part, as follows: "Any parcels or units of land for which a notice of merger had not been recorded on or before January 1, 1984, shall be deemed not to have merged if on January 1, 1984: [¶] (a) The parcel meets each of the following criteria: [¶] (1) Comprises at least 5,000 square feet in area. [¶] (2) Was created in compliance with applicable laws and ordinances in effect at the time of its creation. [¶] (3) Meets current standards for sewage disposal and domestic water supply. [¶] (4) Meets slope density standards. [¶] (5) Has legal access which is adequate for vehicular and safety equipment access and maneuverability. [¶] (6) Development of the parcel would create no health or safety hazards. [¶] (7) The parcel would be consistent with the applicable general plan and any applicable specific plan, other than minimum lot size or density standards."

[10]Government Code section 66451.12 provides as follows: "A merger of parcels becomes effective when the local agency causes to be filed for record with the recorder of the county in which the real property is located, a notice of merger specifying the names of the record owners and particularly describing the real property."

has been no allegation or proof that any notice of merger was ever recorded relative to lot 12, section 66451.19 controls and conclusively required the trial court to find, as it did, that the two parcels of lot 12 had not merged by operation of law.

### 4. *Certificate of Compliance*

The Legislature in enacting a comprehensive scheme to regulate the creation and control of subdivisions and other divisions of land, past and present, and in an obvious effort to provide a fair and equitable scheme to settle the validity of divisions of land occurring in decades past under earlier provisions of law, also provided a means whereby land owners could request that a local government make a determination about the validity of any prior division of land. That means is presently embodied in Government Code section 66499.35. ■ Upon the request of a real property owner, a local agency is empowered to "determine[] whether the real property complies with the provisions of [the Subdivision Map Act] and of local ordinances enacted pursuant thereto." If a city or county determines that the division of the real property complied with the Subdivision Map Act and local ordinances, it then must file and record a "certificate of compliance" with the county recorder. A local agency has authority under this statute to grant or deny such an application for a certificate of compliance. (*Kirk* v. *County of San Luis Obispo* (1984) 156 Cal.App.3d 453, 458 [202 Cal.Rptr. 606].)[11]

■ The issuance and recording of the certificate of compliance in the instant case means that the local government—the City of La Canada-Flintridge—did not see fit to effectuate any merger of the two parcels of lot 12. That determination rested peculiarly with that governmental body, and the trial court was correct in its determination that a collateral attack upon the government agency's actions was inappropriate.

■ The Subdivision Map Act, as a comprehensive scheme to regulate divisions of land, provides specific procedures and remedies for those who are aggrieved by a government agency's determinations on subdivision matters. In the instant case, appellants did not seek to review directly the

---

[11]Subdivision (a) of Government Code section 66499.35 provides as follows: "Any person owning real property or a vendee or that person pursuant to a contract of sale of the real property may request, and a local agency shall determine, whether the real property complies with the provisions of this division and of local ordinances enacted pursuant thereto. Upon making the determination, the city or the county shall cause a certificate of compliance to be filed for record with the recorder of the county in which the real property is located. The certificate of compliance shall identify the real property and shall state that the division thereof complies with applicable provisions of this division and of local ordinances enacted pursuant thereto. The local agency may impose a reasonable fee to cover the cost of issuing and recording the certificate of compliance."

actions of the city and at no time joined them to this action. Instead, appellants, under the cloak of a nuisance action, sought a judicial declaration that the two parcels of lot 12 had merged, in effect seeking to set aside indirectly the conveyance of 344 Georgian Road to respondent Hales. They thus sought to do indirectly what is not permitted as a remedy by section 66499.32 of the Government Code. That section provides that "[a]ny deed of conveyance, sale or contract to sell real property which has been divided, or which has resulted from a division, in violation of the provisions of this division [i.e., the Subdivision Map Act], or of the provisions of local ordinances enacted pursuant to this division, is voidable at the *sole option* of the grantee, buyer or person contracting to purchase . . . within one year after the date of discovery of the violation of the provisions of this division or of local ordinances . . . ." (Italics added.) Appellants are not among those who have the option of having this conveyance voided.

The Subdivision Map Act provides criminal sanctions against illegal subdividers and allows local governments control over such situations. But the act does not require innocent purchasers to suffer for the violations of the grantor or his predecessors. (*Scrogings* v. *Kovatch* (1976) 64 Cal.App.3d 54, 58 [134 Cal.Rptr. 217].)[12]

The City of La Canada-Flintridge issued a certificate of compliance regarding lot 12, thus certifying that the division of the lot was in accordance with applicable law and ordinances. This finding by the city deflects any claim of merger, and the trial court was correct in determining that review in any form of the local agency's determination was barred by the applicable 90-day statute of limitations. That statute is Government Code section 66499.37, which provides as follows: "Any action or proceeding to attack, review, set aside, void or annul the decision of an advisory agency, appeal board or legislative body concerning a subdivision, or of any of the proceedings, acts or determinations taken, done or made prior to such decision, or to determine the reasonableness, legality or validity of any condition attached

---

[12]Section 66499.33 of the Government Code seeks to preserve other remedies which local agencies or private persons may have. That section provides: "This division does not bar any legal, equitable or summary remedy to which any aggrieved local agency or other public agency, or any person, firm, or corporation may otherwise be entitled, and any such local agency or other public agency, or such person, firm, or corporation may file a suit in the superior court of the county in which any real property attempted to be subdivided or sold, leased, or financed in violation of this division or local ordinance enacted pursuant thereto is located, to restrain or enjoin in any attempted or proposed subdivision or sale, lease, or financing in violation of this division or local ordinance enacted pursuant thereto."

The complaint filed in the instant case, however, did not purport to seek restraint or injunction against any attempted or proposed subdivision or sale of real property. Instead, the complaint merely sought to enjoin the construction of the house by having it declared a nuisance and to seek damages based thereon.

thereto, shall not be maintained by any person unless such action or proceeding is commenced and service of summons effected within 90 days after the date of such decision. Thereafter all persons are barred from any such action or proceeding or any defense of invalidity or unreasonableness of such decision or of such proceedings, acts or determinations. . . ." The certificate of compliance was dated May 24, 1989, and recorded June 14, 1989. Assuming the September 14, 1989, date was the one upon which the statute began to run, the 90-day period expired on September 12, 1989. The complaint in the instant case was filed on September 28, 1989. (Cf. *Timberidge Enterprises, Inc.* v. *City of Santa Rosa* (1978) 86 Cal.App.3d 873 [150 Cal.Rptr. 606].) Appellants acquired knowledge of the house construction and the underlying conveyances in August 1989.

Thus, since appellants failed to prove that the two parcels of lot 12 had merged, they also failed to prove that the construction of a house on 344 Georgian Road constituted a violation of the zoning ordinance permitting only one house per lot.

III. *Enforceability of the CC&R's*

On appeal, only the Johnson appellants continue to urge directly that the CC&R's in this case were enforceable. The remaining appellants make an oblique attack, which the Johnson appellants also join, by contending the trial court erred in refusing to admit a document referred to as the "Reynolds Agreement." This agreement, signed apparently by the owners of lots in the Preston tract in 1951 to permit the owners of lot 7—owned by the Reynolds—to construct a house set back from Georgian Road by only 50 feet. Paragraph 11 of the CC&R's required a setback of 75 feet. The so-called Reynolds Agreement made no reference, however, to the CC&R's. Nonetheless, appellants contend that the Reynolds Agreement showed an intent on the part of the property owners in the Preston tract to accept the CC&R's. We agree with the trial court that this document does not constitute a written instrument which created any equitable servitude as to lot 12.

The fact that the Baymillers, owners of lot 12, along with the other property owners in the Preston tract, agreed to a frontage setback as to lot 7 different from that prescribed by the CC&R's does not show any intent with respect to a burden as to lot 12. Whatever reasons the Baymillers may have had for signing the Reynolds Agreement is not shown on the face of the document, nor was hearsay evidence in that regard admissible.

Appellants also claim that the Reynolds Agreement should have been admitted as evidence of estoppel against respondents to deny the applicability of the CC&R's to lot 12. This claim must also be rejected. The California

Supreme Court, in a case relied upon by the trial court herein, has stated that the doctrine of estoppel "has no application in this area. Equitable servitudes in land may be created in this state only by deed, and the expectations of the parties, reasonable or otherwise, are wholly without relevance in the absence of language in the deed having the legal effect of creating such a servitude. [Citations.]" (*Riley* v. *Bear Creek Planning Committee* (1976) 17 Cal.3d 500, 512 [131 Cal.Rptr. 381, 551 P.2d 1213].)

While it is true, as appellants contend, that written instruments other than deeds can create mutual equitable servitudes, such as those embodied in the CC&R's in this case, the Reynolds Agreement hardly qualifies as such an instrument. ■ As we explained in *Scaringe* v. *J. C. C. Enterprises, Inc.* (1988) 205 Cal.App.3d 1536 [253 Cal.Rptr. 344], "[T]o create an equitable servitude, both the grantor and the grantee must intend that the land conveyed by the grantor to the grantee be restricted pursuant to a general plan of restrictions. (*Werner* v. *Graham* [1919] 181 Cal. 174, 184.)" (*Scaringe* v. *J. C. C. Enterprises, Inc.*, *supra*, at p. 1546.) ■ The only intention of the parties to the Reynolds Agreement which their signatures evidence is one to permit the Reynolds to use a setback line of 50 feet rather than 75 feet. Appellants have nowhere indicated that the Reynolds document otherwise recites any reasons for granting this permission. Thus, the Reynolds Agreement does not constitute a written instrument expressing an intent that all the property owners of the Preston tract be bound by the Declaration of Establishment of Conditions and Restrictions filed several years earlier. Hence, the trial court correctly ruled that the document was not admissible, and further correctly ruled in the statement of decision that the CC&R's recorded in 1946 were not enforceable against Lot 12.

## IV. *Expert Witness Fees as Costs*

After hearing appellants' motion to tax costs, the trial court awarded 100 percent of respondents' cost bill—$22,075.42. Of this amount, $14,400.42 represented expert witness fees which respondents claimed pursuant to Code of Civil Procedure section 998. Respondents' claim was based on a settlement offer they mailed to appellants' counsel in a letter dated March 19, 1990, approximately 79 days prior to the first day of trial in this case. On appeal, appellants contend that respondents were not entitled to collect the expert witness fees as part of their costs because the settlement offer was not made in compliance with Code of Civil Procedure section 998. We agree.

■ A trial court may allow costs awarded to a defendant, as a prevailing party, to be augmented (Code Civ. Proc., §§ 998, subd. (a), & 1032) if the defendant served an offer in writing to the losing plaintiffs 10 days prior

to trial and the offer is not accepted prior to trial or within 30 days after it is made, whichever occurs first.[13] Our Supreme Court has held that section 998 reflects California's policy of encouraging settlements. (*Poster* v. *Southern Cal. Rapid Transit Dist.* (1990) 52 Cal.3d 266, 270. [276 Cal.Rptr. 321, 801 P.2d 1072].) To that end, section 998 allows a reduction or augmentation of costs—depending on the circumstances and the outcome of the case—to encourage the parties to assess realistically their positions prior to trial.

Since the party to whom an offer is made stands to bear additional costs at the conclusion of the case if the offer is not accepted, that offeree must have the opportunity to recognize that the offer is being made formally and pursuant to statute. Such an offer is in fact frequently described as a "statutory settlement offer" (*Poster* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 52 Cal.3d at p. 268) or as a "statutory offer to compromise" (*Lum* v. *Superior Court* (1983) 141 Cal.App.3d 952, 954 [190 Cal.Rptr. 599]) pursuant to Code of Civil Procedure section 998. In *Lum* v. *Superior Court*, *supra*, the Court of Appeal held that a statutory offer to compromise made pursuant to this section may not be withdrawn before the expiration of the time limits provided by this statute (i.e., prior to trial or within 30 days after the offer is made, whichever occurs first). Thus, the offeror is also bound by the statute, another reason for observing the formalities of adequate notice.[14]

---

[13]In pertinent part, Code of Civil Procedure section 998 provides: "(a) The costs allowed under Sections 1031 and 1032 shall be withheld or augmented as provided in this section. [¶] (b) Not less than 10 days prior to commencement of trial, any party may serve an offer in writing upon any other party to the action to allow judgment to be taken in accordance with the terms and conditions stated at that time. [¶] (1) If the offer is accepted, the offer with proof of acceptance shall be filed and the clerk or the judge shall enter judgment accordingly. [¶] (2) If the offer is not accepted prior to trial or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the trial. [¶] (3) For purposes of this subdivision, a trial shall be deemed to be actually commenced at the beginning of the opening statement of the plaintiff or counsel, and if there is no opening statement, then at the time of the administering of the oath or affirmation to the first witness, or the introduction of any evidence. [¶] (c) If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment, the plaintiff shall not recover his or her costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding other than an eminent domain action, the court, in its discretion, may require the plaintiff to pay the defendant's costs from the date of filing of the complaint and a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, the preparation or trial of the case by the defendant."

[14]We note that the Supreme Court in *Poster* stated in dictum that a section 998 offer "may be accepted by the offeree during the statutory period unless the offer has been revoked by the offeror." (*Poster* v. *Southern Cal. Rapid Transit Dist.*, *supra*, 52 Cal.3d 266, 272.) However, the offer in *Poster* had not been revoked and the question presented was whether or not the offer had been constructively revoked by subsequent counteroffer. The Supreme Court did not cite or disapprove the *Lum* decision, an opinion rendered several years earlier. Nor is the question of revocation or withdrawal raised in the case at bench.

In the instant case, the letter of March 19, 1990, makes absolutely no reference to Code of Civil Procedure section 998. The letter merely states, "This letter is intended as an invitation to your clients to settle their dispute with my clients, Jay Hales, Betty Herman and Max Herman, Jr. We therefore request that you communicate the . . . settlement proposal to all of your clients." The letter then sets forth an allocation of $40,000 among 12 plaintiffs and indicates a willingness to reallocate the total amount if plaintiffs should so propose. The letter concludes with the following paragraph: "Please let me know immediately as to the response from your clients regarding this proposal. As you are keenly aware, we are all at this point beginning to spend increasingly large amounts of money in connection with the preparation of trial. Accordingly, your prompt attention and response will be appreciated."

This letter can hardly be described as a statutory offer to compromise pursuant to Code of Civil Procedure section 998. Not only is section 998 not referenced or cited, but the letter also required that appellants respond "immediately" to the offer. Since the letter purports to present an offer which arguably would not be open for the 30-day period required by section 998, it is difficult to imagine how appellants could distinguish this offer to settle from any others made prior to this point in the lawsuit. Certainly nothing in the letter would cause appellants to be on notice that they would be subject to a cost award pursuant to section 998 as a result of their rejection or nonacceptance of the offer.

We therefore hold that, as a matter of law, the March 19, 1990, offer does not constitute a statutory offer to compromise pursuant to Code of Civil Procedure section 998. As such, the trial court erred in awarding expert witness fees pursuant to this statute. We will therefore modify the judgment to strike that portion of the award of costs which represents the expert witness fees of $14,400.42. As modified, the costs award to respondents is reduced to $7,675.

## V. *Sanctions and the Remaining Issues*

In light of the result we reach in this case, we need not address the remaining issues of laches and damages. That leaves for discussion the issue of sanctions awarded by the trial court in the amount of $125,000 ($100,000 to defendants and $25,000 to the County of Los Angeles) pursuant to Code of Civil Procedure section 128.5. In its order imposing these sanctions, the court found that "[p]laintiffs' action was frivolous and prosecuted in bad faith and the actions, tactics and conduct of plaintiff Joseph Stell and the law firm of Stell, Levine, Bookman & Weiss were frivolous and in bad faith within the meaning of Code of Civil Procedure Section 128.5 . . . ." We

agree with appellants that under the circumstances of this case, sanctions pursuant to section 128.5 were not warranted.

 Sanctions may be imposed under section 128.5 of the Code of Civil Procedure only if the sanctioned party's conduct is both in bad faith and either frivolous or solely intended to cause unnecessary delay. While action taken solely to harass an opponent will support a finding of bad faith as a matter of law, actions that merely lack merit, without more, will not. (*Javor v. Dellinger* (1992) 2 Cal.App.4th 1258, 1260-1262 [3 Cal.Rptr.2d 662].) The record herein does not demonstrate that this lawsuit was undertaken in bad faith or that tactics of delay were undertaken. Despite a finding made by the trial court, it seems eminently clear that appellants' actions were not aimed at delay but to obtain redress from construction in their residential neighborhood which changed to some degree its character and tended to eradicate CC&R's by which appellants felt they were protected.

The trial court made six findings upon which it based its conclusion that appellants' action was frivolous and prosecuted in bad faith. The first three dealt with appellants' legal posture. The court concluded that (1) appellants' own legal search indicated California law was contrary to their position, (2) appellants failed to establish a prima facie case at trial, and (3) the first amended complaint as verified by appellants' attorney (appellant Stell) was so totally and completely without merit as to support an inference that it was filed in bad faith. All three of these findings must be rejected.

First, appellants' legal research, which the trial court rejected, correctly indicated that zoning violations can constitute a private nuisance which may be abated or enjoined. Appellants' counsel, appellant Stell, failed to prove all the elements of this cause of action. This failure stemmed not from any evident desire to harass respondents or delay the proceedings, but most probably either from oversight or from an unwarranted assumption that the issue of the area of the flag lot was not disputed or that the issue of undersize had been conceded by respondents. Considering the lengths to which appellants have gone to urge both the trial court (posttrial) and this court to conclude that the tract map and the legal description contained in the certificate of compliance constituted sufficient evidence of the undersized nature of the lot, we find it implausible that appellants deliberately omitted that evidence at trial. Although mere proof of zoning violation would, in our view, be insufficient to prove a nuisance, it is nonetheless clear that the first amended complaint was not "totally and completely without merit," as the trial court concluded. Thus, no inference of bad faith can be drawn by reason of its filing.

The trial court also found, based on the testimony at the sanctions hearing of Max Herman, Jr., that plaintiffs had maliciously brought the action with

the intention of harassing the defendants. Although appellant Robert Asher denied making the statement attributed to him by Herman, the trial court, in reaching its conclusions on sanctions, apparently accepted the testimony of Herman and rejected that of Asher. Even if we assume that Herman's testimony was true, as did the trial court, that testimony does not lead to a conclusion that appellants sought improperly to harass respondent Hales. Rather, at one point during this trial appellants indicated their belief that Hales specialized in building on problem lots and that Hales purchased 344 Georgian Road and built upon it well knowing that his actions were in violation of zoning ordinances and that such action would change the character of the neighborhood as shaped by the CC&R's. Thus, appellants could well and properly seek to discourage construction on nonconforming lots by seeking nuisance damages as opposed to seeking removal of a house which was well under construction by the time in early September when appellants should have become versed in the parameters of their legal and equitable remedies.

Respondents cite no principle of law which required appellants to seek a temporary restraining order. Moreover, appellant Stell, certainly in his letters to Hales, warned that continued construction would be met by a lawsuit. Other testimony indicated that appellants believed, based on legal research, in the validity of their position that the violation of the zoning ordinances constituted an actionable nuisance, and that the principal injury that could be inflicted upon Hales would be the extraction of damages since appellants' counsel, appellant Stell, indicated to the trial court more than once his belief that removal of the house by judicial order might not be a reasonable outcome of this case under the circumstances.

As to the fact that Stell was allegedly unprepared regarding pretrial matters, the trial court noted that sanctions had previously been imposed on appellant Stell. Thus, without more, it would appear that the trial court was attempting to impose further sanctions concerning conduct which had already been sanctioned. Moreover, considering the length and number of issues dealt with by stipulation and concession in the joint issues conference statement, appellants should not be doubly punished for pretrial conduct relating to the joint issues conference. It is true, as the trial court found, that appellant Stell was often unprepared during the trial and did not or could not directly respond to the court's inquiries as to legal authorities for his positions. And, although appellants, through their counsel, appellant Stell, failed to present any substantial evidence relating to a common plan or scheme or conspiracy among respondents, much of the evidence that appellants through Stell did seek to have admitted regarding those issues was rejected by the trial court as irrelevant, despite offers of proof.

Finally, appellant Stell cannot be described as having a "cavalier attitude" toward the litigation. Certainly the evidence was clear that his own home was the most directly affected by the two-story house built next door which looked directly into his backyard, a yard in which Stell and his family had enjoyed considerable privacy for many years. Since there was no evidence suggesting that Stell did not in good faith believe, at least prior to the lawsuit, that all the lots in his tract were subject to the CC&R's preventing two-story houses from being constructed, it is not possible to import "bad faith" to appellant Stell. The trial court focused considerable attention on the fact that appellants were unable to connect lot 12 to the CC&R's. Indeed, they were unable to do so. Nonetheless, the conduct of the owners of lot 12 in signing the Reynolds Agreement and in other matters was certainly sufficient to cause the neighbors to entertain the notion that the CC&R's applied to lot 12. Such a belief, however, as we have indicated, is insufficient to give rise to an equitable servitude. That does not mean that appellants' attempt to prove such a servitude was made in bad faith.

In light of the foregoing circumstances, we find that the trial court abused its discretion in awarding attorney fees and expenses incurred by respondents as sanctions in this matter.

### DISPOSITION

The order awarding costs is reduced to $7,675. The order awarding sanctions pursuant to Code of Civil Procedure section 128.5 is reversed. In all other respects, the judgment is affirmed. Each party is to bear its own costs on appeal.

Grignon, J., and Jackson, J.,* concurred.

A petition for a rehearing was denied January 7, 1993.

---

*Judge of the Municipal Court for the Antelope Judicial District sitting under assignment by the Chairperson of the Judicial Council.