[No. H023716. Sixth Dist. Nov. 20, 2003.]

RICHARD van't ROOD, Plaintiff and Appellant;
JOHN PEREIRA et al., Plaintiffs and Respondents, v.
COUNTY OF SANTA CLARA, Defendant and Respondent.

550

**COUNSEL**

Law Offices of Craig J. Bassett and Craig J. Bassett for Plaintiff and Appellant.

No appearance for Plaintiffs and Respondents.

Ann Miller Ravel, County Counsel and David E. Kahn, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**WUNDERLICH, J.**—In 1970, a landowner subdivided his property and sold portions of it to two adjoining neighbors. Nearly 30 years later, it came to light that the map filed in connection with the property division apparently merged each neighbor's property holdings. That revelation prompted the affected neighbors to bring this proceeding to exclude their property from the subdivision. Following a three-day hearing, the trial court denied the petition for exclusion. One of the petitioners brought this appeal.

As we explain below, we conclude that the trial court should have granted the petition for exclusion from the subdivision map. We therefore reverse the judgment.

### FACTUAL BACKGROUND

In 1970, John R. Weis sought permission from Santa Clara County (County) to divide his 10-acre property in San Martin. Weis initially applied to divide his property into two lots, but later modified his application to seek a division into three parcels. Weis planned to keep one parcel, about three-and-a-half acres in size, on which he and his wife had a home. He planned to sell the other two parcels to two adjoining neighbors, one to the northwest and one to the northeast. At the time, the zoning permitted one-acre minimum lots.

In early April 1970, Weis signed a contract with his neighbors to the northwest, John W. Pereira and Edwin A. Vargas (collectively, Pereira/Vargas). At that time, Pereira and Vargas, partners in the dairy business, each owned undivided interests in two adjoining parcels, which together comprised nearly 12 acres. One of their preexisting parcels was approximately 5.3 acres in size, while the other comprised about 6.3 acres. Only one of the two preexisting Pereira/Vargas parcels shared a boundary with Weis's property. The contract between Pereira/Vargas and Weis called for the purchase of about 3.9 acres of additional land.

Two weeks later, Weis signed a similar contract with his neighbor to the northeast, Frank B. Pacheco. Like Pereira and Vargas, Pacheco was a dairy farmer who then owned two adjoining parcels, one comprising 10 acres and the other three-quarters of an acre. Both of Pacheco's preexisting parcels shared a boundary with Weis's property. Pacheco's contract with Weis called for the sale of an estimated 2.8 acres of additional land. The contract further states: "Seller to provide Buyer with record of survey and complete lot split procedure."

Weis submitted his land division application as an exemption request. At the time of the application, a provision of the Santa Clara County Ordinance Code authorized the County's Land Development Committee (Committee) to exempt from local regulation certain land divisions involving four or fewer parcels. The ordinance set forth standards for the Committee's grant of both discretionary and mandatory exemptions.

As part of his application for a land division, Weis submitted a plot plan showing his 10-acre property alone, divided into three parcels. The County stamped the plot plan "Tentative Map."

On April 21, 1970, Weis appeared at a hearing before the Land Development Committee in connection with his application. Neither Pereira nor Vargas nor Pacheco knew of the hearing, and none of them attended. The Committee conditionally approved Weis's application at the hearing.[1] Several days later, the Committee formally confirmed its grant of the exemption request, subject to a survey of parcels and the recording of a parcel map.

As part of the approval process, the tentative map was stamped "Conditionally approved by the Land Development Committee on April 21, 1970."

---

[1] The pertinent portion of the Committee's minutes for April 21, 1970, reads as follows: "In attendance was John Weis. This item was continued from February 9, 1970. Weis indicated that he was selling the northwesterly portion of his land to the northwesterly owner and the northeasterly portion of his land to the northeasterly owner and was retaining a three acre site containing his home. All departments made recommendations. The application for exemption was conditionally approved on a motion by Bristow, seconded by Roetttger. The vote: 5 Ayes, 0 Noes."

In contrast to the tentative map submitted by Weis, the conditionally approved tentative map includes "tie-in marks"[2]—added in pencil—connecting the parcels that Weis planned to sell with the existing properties owned by Pereira/Vargas and Pacheco. There was no direct evidence at trial of when the penciled tie-in marks were added or by whom.[3]

The 1970 Land Development Committee subdivision file contains a land development check sheet that includes this handwritten comment, dated April 21, 1970: "Parcel Map to include gross area of all 3 related parcels—to Henke." Henke was an employee of Westfall Engineers, the survey firm hired by Weis to prepare the parcel map. Consistent with the County's apparent instruction, the parcel map prepared by Westfall Engineers included not only Weis's land, but also the land already belonging to Pereira/Vargas and to Pacheco, with new gross acreages appearing for each. As noted above, at the time the parcel map was prepared, Weis owned a single 10-acre parcel, which he proposed to divide into three; Pereira/Vargas owned two parcels totaling some 12 acres; and Pacheco owned two parcels totaling 10.75 acres. Nevertheless, only three numbered parcels appear on the parcel map: Parcel 1, which shows Weis's land as a single, smaller parcel; Parcel 2, which shows Pereira/Vargas's land as a single, larger parcel containing their two existing parcels plus the land they proposed to buy from Weis, all connected by tie-in marks; and Parcel 3, which similarly shows Pacheco's land as a single, larger parcel containing his two existing parcels plus the land he proposed to buy from Weis, all connected by tie-in marks. Apparently, none of the affected neighbors ever saw the parcel map either before its recordation or for many years thereafter.

On June 17, 1970, the county surveyor certified the parcel map. On June 18, 1970, the parcel map was filed in the County's records, in Book 269 of Maps at page 43.

On June 19, 1970, grant deeds were recorded for Weis's conveyances to Pereira/Vargas and to Pacheco. The deed to Pereira/Vargas contains a metes and bounds description of the portion of Weis's property that they purchased from him. The deed to Pacheco likewise contains a metes and bounds description of the property that he purchased from Weis, which it identifies as "Parcel One." In addition, the Pacheco deed identifies a "Parcel Two,"

[2] The marks, in the shape of an elongated Z, also were referred to at times during trial as "crow's feet" or "hooked lines." According to two expert trial witnesses, attorney Robert Merritt and surveyor Earl Cross, the marks signify common property ownership.

[3] One witness, James Sirr, a longtime county employee, answered affirmatively when asked if that was "something that would have been done at the Land Development Committee." Another witness, Arthur Pion, a longtime former county employee, testified concerning similar tie-in marks shown on another copy of the map, saying: "More than likely, they would have been put there by Engineering Services [county] staff."

described as a 30-foot wide easement for ingress and egress, apparently over the larger of the two parcels that Pacheco already owned. Neither the Pereira/Vargas deed nor the Pacheco deed contains any reference to the parcel map. Weis financed both sales, in each case taking a promissory note secured by a deed of trust encumbering the real property separately described in each grant deed.

The lots that Pereira/Vargas and Pacheco acquired from Weis each received a separate tax assessment and a separate assessor's parcel number. In addition, at least one of the two lots acquired in 1970 was the subject of a separate Williamson Act contract (an agreement with the county to restrict the property to agricultural use). Pereira/Vargas and Pacheco each fenced off their newly acquired land, using it for many years to pasture yearling cows.

Nearly three decades passed. During that time, both Weis and Pacheco died. Zoning for the area also changed, from one-acre to 20-acre minimum lots.

In 1999, appellant Richard van't Rood (van't Rood) entered a contract to purchase the Pacheco property. The property was marketed as two separate parcels, one being Pacheco's original 10.75 acres and the other being the two-plus acres acquired from Weis in 1970. After receiving a separate title report on each parcel, van't Rood surmised that the original 10.75-acre property itself might consist of two legal lots, thereby giving him a total of three separate parcels under contract. In late 1999, prior to completing the property purchase, van't Rood submitted a "pre-application" to the County for a lot line adjustment to alter the boundaries of the three legal lots he thought he was purchasing. Based on the information available at the pre-application meeting, it appeared that the Pacheco property consisted of three legal, nonconforming lots. Appellant then completed his purchase of the property. The grant deed from Pacheco's trust to van't Rood was recorded in December 1999; it describes three parcels.

In January 2000, van't Rood formally applied for a three-lot lot line adjustment. In the course of evaluating the application, the County discovered the 1970 parcel map, which showed van't Rood's property as a single merged parcel. The County then informed van't Rood of its conclusion that he had only one parcel, not three. In the ensuing months, van't Rood sought to confirm that he had three parcels by applying to the County for certificates of compliance. He later withdrew that application when he became convinced that it was "pointless" to proceed in the face of the County's insistence on the validity of the 1970 parcel map showing his parcels as merged.

This legal action followed.

## PROCEDURAL HISTORY

■ This proceeding was brought pursuant to provisions of the Subdivision Map Act that authorize landowners to petition to exclude their property from a subdivision map.[4] (See Gov. Code, §§ 66499.21–66499.29.) The statute provides that the court "may" grant such a petition if "the petitioners produce to the court satisfactory evidence of the necessity of the exclusion of the real property" and "that there is no reasonable objection to making such exclusion." (Gov. Code, § 66499.25.)

Van't Rood and Pereira initiated this proceeding in June 2000, seeking exclusion from the 1970 parcel map or a declaration that the map was invalid. The County objected to the initial petition, partly on the procedural ground that it was not signed and verified by owners of at least two-thirds of the affected property interests as required by statute. (See Gov. Code, § 66499.22.) In August 2000, an amended petition was filed by van't Rood, Pereira, and Vargas (collectively, petitioners). The County then objected to the amended petition. Among its objections were these: that petitioners failed to exhaust their administrative remedies; that the petition was time barred; that the 1970 parcel map is valid; that petitioners had constructive notice of the 1970 parcel map; that the consent of petitioners or their predecessors to the 1970 parcel map was not required by the then-governing statute; that the issuance of title insurance on the separately described property purchased in 1970 is irrelevant to the number of parcels in the subdivision; and that the separate property tax assessment of the 1970 lots is also irrelevant.

In May 2001, the trial court conducted an extensive evidentiary hearing on the petition, which consumed three court days. Among the witnesses were petitioners Pereira, Vargas, and van't Rood, as well as Susan Reggiardo (Pereira's daughter and Vargas's niece) and Nancy Pacheco Thompson (Pacheco's daughter). Various current and former County employees also testified, including Zachary Carter, planning department technician; Michael Lopez, planning department coordinator; Carolyn T. Walsh, principal planner; James F. Sirr, civil engineer; Martin Marcott, county surveyor; and Arthur J. Pion, a former employee of the County Planning Department. There was also expert testimony from attorney Robert Merritt, from surveyor Earl Cross, and from surveyor and engineer Warren McDowell. At the conclusion of the hearing, the court announced its decision denying the petition. The

---

[4] Apparently, exclusion proceedings are rare. (See Curtin & Merritt, Cal. Subdivision Map Act and the Development Process (Cont.Ed.Bar 2d ed. 2003) § 12.10, p. 325 [exclusion procedure "is rarely used"].) The witnesses in this matter included planning professionals with many decades of collective experience, yet only one of them had ever encountered such a petition previously—and then only once. Nor have we found any published cases interpreting any of the provisions that govern the exclusion proceeding.

court directed the County to prepare a statement of decision, which it did. Petitioners objected to the proposed statement of decision, a hearing was held, and the court directed petitioners' attorney to prepare a revised statement.

In July 2000, the court filed its statement of decision, approved as to form by counsel for both sides. The statement of decision recites the court's legal conclusions, including these: that Weis was the actual agent of Pereira/Vargas and Pacheco; that Pereira/Vargas and Pacheco authorized Weis to do whatever was reasonably necessary to obtain the County's approval so that they could acquire additional land from him; that petitioners' preexisting parcels were merged as a result of the 1970 parcel map; that there is no necessity to exclude the petitioners' property from the 1970 parcel map; and that the County's objections to exclusion are reasonable.

In September 2000, the court entered its formal judgment denying the petition. Van't Rood then moved for a new trial, asserting that the judgment was unsupported by the evidence and contrary to law, and also urging surprise as a ground. (Code Civ. Proc., § 657.) The trial court denied the motion for new trial.

This timely appeal ensued, brought by van't Rood alone.

## APPEALABILITY

At the outset, the County raises two appealability issues, though it does not frame them as such. The threshold issues are critical "since the question of appealability goes to our jurisdiction . . . . [Citations.]" (*Olson v. Cory* (1983) 35 Cal.3d 390, 398 [197 Cal.Rptr. 843, 673 P.2d 720]; accord, *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126 [32 Cal.Rptr.2d 275, 876 P.2d 1074].) The County cites two separate grounds in support of its request that we "deny" this appeal.

First, the County asserts that van't Rood cannot prosecute this appeal independently of Pereira/Vargas, because he does not own two-thirds of the property to be excluded from the map. ■ Under the statute, participation by owners of two-thirds of the affected property is a requirement for initiating the exclusion proceeding. (Gov. Code, § 66499.22.)[5] But there is no suggestion in the statute that the participation requirement carries through to appeal.

---

[5] That provision reads in pertinent part as follows: "A proceeding for exclusion shall be initiated by filing a petition therefor in the offices of the county surveyor and clerk of the board of supervisors of the county in which the subdivision or the portion thereof sought to be excluded is situated. . . . The petition shall be signed and verified by the owners of at least two-thirds of the total area of the real property sought to be excluded." (Gov. Code, § 66499.22.)

We therefore apply the usual rule of appellate standing, which provides: "Any party aggrieved may appeal in the cases prescribed in this title." (Code Civ. Proc., § 902.) "One is considered, 'aggrieved' whose rights or interests are injuriously affected by the judgment. [Citations.]" (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 [97 Cal.Rptr. 385, 488 P.2d 953].) As we have previously observed, appellate standing "should be 'liberally construed,' with 'any doubts resolved in favor of the right to appeal.' [Citation.]" (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 540 [104 Cal.Rptr.2d 686].) Under those standards, van't Rood clearly is an aggrieved party entitled to prosecute this appeal.

Second, the County urges that we "deny" the appeal based on legislative changes at the local and state level occurring after trial. The County first cites the adoption of a local ordinance in February 2002, which rezoned "many parcels to bring them into conformity with the General Plan." One effect of the ordinance was to reduce the minimum lot size of van't Rood's property from 20 acres to five. The County also mentions state legislation, effective January 2002, which requires that lot line adjustments comply with the General Plan. According to the County, the legislation effectively precludes van't Rood from using the lot line adjustment process to obtain three parcels, since the five-acre zoning allows only two lots on his 13.4-acre property.

"Except in rare cases where events subsequent to the ruling under review have rendered the case totally moot, we do not, and may not, consider subsequent events." (*In re Marriage of Jacobs* (1981) 126 Cal.App.3d 832, 835 [179 Cal.Rptr. 169].) A case is moot when the decision of the reviewing court "can have no practical impact or provide the parties effectual relief. [Citation.]" (*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888 [92 Cal.Rptr.2d 268]. Accord, *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315–1316 [94 Cal.Rptr.2d 798].) Subsequent legislation can render a pending appeal moot. (*Equi v. San Francisco* (1936) 13 Cal.App.2d 140, 141–142 [56 P.2d 590].) Here, however, the County concedes that the legislation does not "automatically" moot van't Rood's appeal. Nevertheless, the County argues, "the recent legislation makes it possible for him to apply for a subdivision of his property into two parcels and also would make it illegal for him to obtain the lot line adjustment he was seeking to allow three lots . . . ." Given these new opportunities and restrictions, the County asserts, van't Rood cannot now demonstrate the requisite necessity to exclude his property from the 1970 parcel map.

We disagree with the County's view. ■ In essence, the County contends that the later-enacted zoning ordinance gives van't Rood an alternative remedy to exclusion—applying for a new subdivision of his property into

two lots. But the existence of an alternative remedy does not preclude us from granting van't Rood effective relief with respect to the remedy he pursued in this proceeding. That being so, the appeal is not moot. (*Woodward Park Homeowners Assn. v. Garreks, Inc., supra,* 77 Cal.App.4th at p. 888.) Furthermore, we question whether the subsequent legislation even applies to this controversy. As we have previously observed, "there is a long-standing and well-established presumption against the retroactive application of statutes. [Citation.]" (*In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 171 [110 Cal.Rptr.2d 111].) Thus, " 'in the absence of a clear legislative intent to the contrary statutory enactments apply prospectively.' [Citation.]" (*Ibid.*) Furthermore, even in the face of a clear legislative signal, "we may not give a statute retroactive effect if doing so offends constitutional principles. [Citation.]" (*Id.* at p. 174.)

In short, we reject both of the County's asserted grounds for dismissal. We conclude that van't Rood's appeal should be heard on its merits.

## ISSUES ON APPEAL

### I. *Validity of the Parcel Map*

Van't Rood's principal attack on the validity of the map rests on his contention that parcel maps are conveyances. He argues that the 1970 map is invalid because it failed to comply with the law governing real estate conveyances. He further argues that the 1970 map is a "wild" conveyance outside the chain of title that failed to afford him constructive notice and that therefore does not bind him as a bona fide purchaser.

Van't Rood also challenges the map's validity on constitutional grounds, asserting that the involuntary merger of his separate parcels of land violates due process, because it constitutes a taking of his property without adequate notice or the opportunity to be heard.

### II. *Agency*

Van't Rood contends that there is no evidence to support the trial court's finding of "oral agency." He further contends that the court's resolution of the case on the basis of agency constituted undue surprise, which required the grant of a new trial.

### III. *Exclusion*

Ultimately, the question presented by this appeal is whether petitioners met the statutory requirements for exclusion from the 1970 parcel map by demonstrating both necessity and the lack of any reasonable objection.

## STANDARDS OF REVIEW

■ We independently review the judgment to the extent it presents questions of law. The interpretation of statutes is a question of law. (See, e.g., *In re Marriage of Petropoulos, supra,* 91 Cal.App.4th at p. 169.). ■ The interpretation of documents likewise presents a question of law in cases such as this one, where no conflicting extrinsic evidence has been admitted to explain an instrument's meaning. (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710 [50 Cal.Rptr.2d 323].)

■ Agency is generally a question of fact. (*Brokaw v. Black-Foxe Military Institute* (1951) 37 Cal.2d 274, 278 [231 P.2d 816]; *Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619 [20 Cal.Rptr.2d 358].) Where conflicting evidence of agency is presented, we review the trial court's determinations for substantial evidence. (*Associated Creditors' Agency v. Davis* (1975) 13 Cal.3d 374, 383 [118 Cal.Rptr. 772, 530 P.2d 1084].) Here, however, the facts are essentially undisputed, as the County's counsel acknowledged during his closing argument at trial. "When the essential facts are not in conflict and the evidence is susceptible to a single inference, the agency determination is a matter of law for the court. [Citation.]" (*Emery v. Visa Internat. Service Assn.* (2002) 95 Cal.App.4th 952, 960 [116 Cal.Rptr.2d 25]. See also, e.g., *Magnecomp Corp. v. Athene Co.* (1989) 209 Cal.App.3d 526, 536 [257 Cal.Rptr. 278].)

## DISCUSSION

### I. *Validity of the Parcel Map*

#### A. *The Map as a Conveyance*

Much of van't Rood's attack on the 1970 parcel map relies on his argument that it constitutes an invalid conveyance. It has been said that a subdivision map "recorded locally in the chain of title . . . partakes of the qualifications of a conveyance. [Citations.]" (*John Taft Corp. v. Advisory Agency* (1984) 161 Cal.App.3d 749, 756 [207 Cal.Rptr. 840]; cf., *Stearns v. Title Ins. & Trust Co.* (1971) 18 Cal.App.3d 162, 169 [95 Cal.Rptr. 682] [record of survey is not a conveyance]; see, Civ. Code, § 1215 [defining conveyance].)

But as we explain below, our analysis of the map's validity does not depend on its characterization as a real estate conveyance. For that reason, we need not and do not decide whether parcel maps are subject to real estate conveyancing law.

B. *Subdivision Map Act*

Instead, our assessment of the validity of the 1970 parcel map logically starts with the Subdivision Map Act. (Gov. Code, §§ 66410–66499.37.) We begin by reviewing the Act's history, purposes, and significance. Next, we discuss the specific provisions of the Act—both current and former—that pertain to the questions presented here. We then apply those provisions to the undisputed facts of this case.

1. *History*

The Subdivision Map Act has regulated the division of land in California since the nineteenth century. "The first Subdivision Map Act was enacted in 1893. Subsequent versions of the Act were enacted in 1907, 1929, 1937 and 1943. The modern latest version of the Act was enacted as part of the Government Code in 1974." (Longtin, Cal. Land Use (2003 Supp.) Subdivisions, § 6.18, p. 463.) "All versions of the Act enacted subsequent to the first Act in 1893 contained grandfather clauses exempting from the current Act those subdivisions established in compliance with laws in effect when recorded." (*Ibid.*)

In the earliest twentieth-century version of the Act, "development was left almost entirely to the discretion of the developer. The act provided for no governmental regulation, and required submission of a subdivision map to local officials only to allow them to check its accuracy in order to assure good title to the resulting parcels." (2 Longtin, Cal. Land Use (2d ed. 1987) Subdivisions, § 6.02, p. 582.) "With the advent of zoning in the 1920s, subdivision mapping began to assume some importance as a land use control." (*Ibid.*) The 1929 version of the Act first authorized local subdivision regulations. (*Ibid.*) The 1937 enactment first prohibited sellers from conveying subdivided lots without prior local approval. (*Ibid.*) "The 1937 enactment was the basis for the 1943 codification which, together with many amendments thereto, remained in effect until the 1974 recodification. [Citation.]" (*Ibid.*) But by the late 1960's, "many uncoordinated amendments" had rendered the Act "so complex and disorganized that the need for recodification was apparent. Following attempts in 1971, 1972 and 1973, the Subdivision Map Act, which had been codified in the Business and Professions Code ([§] 11500 et seq.), was recodified in [Government Code section] 66410 et seq. [Citation.]" (*Ibid.*)

2. *Statutory Objectives*

The Subdivision Map Act has three principal goals: to encourage orderly community development, to prevent undue burdens on the public, and

to protect individual real estate buyers. (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 997–998 [129 Cal.Rptr.2d 869, 62 P.3d 103]; see 61 Ops.Cal.Atty.Gen. 299, 301 (1978); 2 Longtin, Cal. Land Use, *supra,* Subdivisions, § 6.03, p. 583; Curtin & Merritt, Subdivision Map Act Manual (2003 ed.) p. 1.) Thus, the Act serves "to coordinate planning with the community pattern laid out by local authorities and to assure proper improvements are made so the area does not become an undue burden on the taxpayer [citation]." (*Bright v. Board of Supervisors* (1977) 66 Cal.App.3d 191, 194 [135 Cal.Rptr. 758]; accord, *Gardner v. County of Sonoma, supra,* 29 Cal.4th at pp. 997–998; *Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93].) It also serves "to protect individual transferees as well as the public at large." (*Bright v. Board of Supervisors, supra,* 66 Cal.App.3d at pp. 195–196; see also, e.g., *John Taft Corp. v. Advisory Agency, supra,* 161 Cal.App.3d at p. 755.)

### 3. *Importance and Effect*

"As now codified in the Government Code, the Subdivision Map Act constitutes the major land use permit control vehicle for urban planning and environmental protection. [Citations.]" (2 Longtin, Cal. Land Use, *supra,* Subdivisions, § 6.02, p. 583; see also *Gardner v. County of Sonoma, supra,* 29 Cal.4th at p. 996.) When "a landowner wishes to subdivide its property, the proposed subdivision must be consistent with applicable zoning ordinances and the landowner must comply with the Subdivision Map Act. [Citation.]" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1197 [52 Cal.Rptr.2d 518]; see also, e.g., Gov. Code, § 66473.5 [subdivision must be consistent with local general plan]; *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 936 [154 Cal.Rptr. 503, 593 P.2d 200] [same].)

▮ To comply with the Act, the landowner must secure local approval and record an appropriate map. (*John Taft Corp. v. Advisory Agency, supra,* 161 Cal.App.3d at p. 755.) A final (subdivision) map is generally required for subdivisions of five or more parcels. (See Gov. Code, § 66426; see generally Curtin & Merritt, Subdivision Map Act Manual, *supra,* p. 5.) A parcel map is generally required for the creation of four or fewer parcels. (See Gov. Code, § 66428; see generally Curtin & Merritt, Subdivision Map Act Manual, *supra,* p. 5.) Subdivided lands may not be legally sold, leased, or financed without the required approval and map. (*John Taft Corp. v. Advisory Agency, supra,* 161 Cal.App.3d at p. 755; see, Gov. Code, § 66499.30, subd. (a) [prohibiting sale, lease, or finance of property until required final subdivision map is filed for record]; and subd. (b) [prohibiting sale, lease, or finance of property until required parcel map is filed for record].)

■ Though compliance with the Subdivision Map Act is a necessary predicate to the sale of lands within its ambit, subdivision approval does not carry with it the unfettered right to build on those lands. Even after subdivision, "a builder must comply with the laws which are in effect at the time a building permit is issued, including the laws which were enacted after application for the permit. [Citations.]" (*Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 795 [132 Cal.Rptr. 386, 553 P.2d 546]; see also, e.g., *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 760 [29 Cal.Rptr.2d 804, 872 P.2d 143] [Subdivision Map Act's merger provisions do not affect applicability of zoning ordinances that require minimum parcel size for development]; *Beck Development Co. v. Southern Pacific Transportation Co., supra,* 44 Cal.App.4th at p. 1199 [after subdivision, "developer must still comply with any applicable requirements for obtaining building permits"].)

### 4. *Key Provisions*

#### a. *Subdivision*

The concept of a "subdivision" obviously is one of the basic underpinnings of the Subdivision Map Act. The Act therefore defines "subdivision." It also provides a mechanism for determining the legality of a previously established subdivision.

The Act currently defines "subdivision" as "the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale, lease or financing, whether immediate or future." (Gov. Code, § 66424.) "Subdivision" thus generally refers to a *division* of land for sale, lease, or financing. (Cf., *Hirsch v. City of Mountain View* (1976) 64 Cal.App.3d 425, 432 [134 Cal.Rptr. 519] [consolidation of six parcels into a single, larger lot could constitute a subdivision of land, for purposes of imposing subdivision fees, given landowners' goal of increased density through consolidation].) ■ The Act's current definition of "subdivision" is not based on the number of parcels resulting from the land division; a division into as few as two parcels now constitutes a subdivision under the Act.[6]

Prior to 1974, by contrast, the statutory definition of a subdivision expressly applied only to divisions that resulted in five or more parcels. (See

---

[6] Although the statutory definition no longer distinguishes between subdivisions based on their size, other provisions of the Map Act do. Among other things, as a general rule, "a subdivision of five or more parcels requires a tentative and a final map; a subdivision of four or fewer requires just a parcel map." (Curtin & Merritt, Subdivision Map Act Manual, *supra,* p. 5.)

Bus. & Prof. Code, former § 11535, subd. (a), added by Stats. 1943, ch. 128, § 1, p. 867; *Stell v. Jay Hales Development Co.* (1992) 11 Cal.App.4th 1214, 1224 [15 Cal.Rptr.2d 220]; 55 Ops.Cal.Atty.Gen. 414, 417 (1972).) The prior Subdivision Map Act thus did not cover land divisions that created four or fewer parcels. (*Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at p. 1224.) But those smaller divisions nevertheless were subject to regulation by local ordinance. (See Bus. & Prof. Code, former § 11540.1, as enacted by Stats. 1949, ch. 1100, § 1, p. 2001; *Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at p. 1224.)

In this case, under then current law, Weis's 1970 three-parcel land division was not subject to the Subdivision Map Act. (Bus. & Prof. Code, former § 11535, subd. (a).) But it was subject to a local ordinance, Santa Clara County Ordinance Code, former section 12.2.3. As noted above, that local provision allowed certain land divisions involving four or fewer parcels to be exempt from regulation.

In order to be valid, a subdivision must be "in compliance with or exempt from" any applicable subdivision law or ordinance "in effect at the time the subdivision was established." (Gov. Code, § 66499.30, subd. (d).) A certificate of compliance establishes the validity of a prior land division. (See Gov. Code, § 66499.35; *Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at p. 1227; see also, e.g., *Lakeview Meadows Ranch v. County of Santa Clara* (1994) 27 Cal.App.4th 593, 600 [32 Cal.Rptr.2d 615] [landowner entitled to certificates of compliance as a matter of law, where its parcels were lawfully created prior to enactment of any subdivision laws]; see generally Curtin & Merritt, Subdivision Map Act Manual, *supra,* pp. 74–75.) In this case, van't Rood submitted an application for a certificate of compliance, which he later withdrew.

### b. *Merger*

"Merger refers to the combination of two lots in common ownership . . . ." (9 Miller & Starr, Cal. Real Estate (3d ed. 2001) Subdivisions, § 25:149, p. 367.) In this case, the trial court concluded that petitioners' preexisting parcels were merged as a result of the 1970 parcel map. In reaching that conclusion, the court relied on the tie-in marks shown on the map and on the fact that the map shows only three parcels.[7] To determine whether the trial

---

[7] According to some of the witnesses in this case, the tie-in marks signify only common ownership. For example, attorney Robert Merritt testified that such marks on subdivision and parcel maps generally mean that "the parcels are in common ownership." Surveyor and engineer Warren McDowell testified that "a hook would be used . . . to show the [existing] ownership." And surveyor Earl Cross testified "that, in the surveying and engineering world," tie-in marks are "drafting symbols that show common ownership." Cross added that "they don't serve any purpose as to the result of the parcel map itself."

court erred in concluding that the properties were merged, we first consider the Subdivision Map Act's merger provisions.

The Subdivision Map Act has contained express merger provisions since 1976. (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 752; see Gov. Code, § 66451.10 et seq.) According to one commentator: "The subject of merger and anti-merger has had a tortuous history of successive statutes . . . ." (9 Miller & Starr, Cal. Real Estate, *supra,* § 25:149, p. 367.) Under the original 1976 merger provision, merger of substandard parcels was automatic. (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 755, discussing Gov. Code, former § 66424.2, Stats. 1976, ch. 928, § 4, p. 2120.) "The 1977 amendment replaced the provision for automatic merger with one authorizing local agencies to adopt the merger provisions by ordinance. The ordinance could also deem any automatically merged parcels to be unmerged. (Stats. 1977, ch. 234, § 5, p. 1034.) In 1980, all parcels merged by operation of law (under the 1976 statute) and not deemed merged by ordinance were automatically deemed unmerged. (Stats. 1980, ch. 402, § 2, p. 788; *id.,* ch. 1217, §§ 2–3, p. 4127.)" (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 755.) The current merger provisions were enacted in 1983 and amended over the next three years. (*Ibid.*) The legislation enacted in the 1980's operated to "clarify and 'unmerge' contiguous parcels where local agencies had not elected to pursue the notice and hearing option previously provided by the Act." (*Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at p. 1226.)

The Act's current merger provisions "appear to reflect two overall concerns. First, they provide landowners with elaborate procedural safeguards of notice and opportunity to be heard before their lots can be involuntarily merged." (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 752.) Second, they reveal *"a state concern over local regulation of parcel merger for purposes of development"* as well as for purposes of sale, lease, or financing. (*Ibid.*)

*Automatic Merger*

Under the Act's merger provisions, "contiguous parcels of land are not automatically merged by virtue of being held by the same owner." (*Morehart v.*

---

But other witnesses testified that the tie-in marks demonstrate merger, when taken in the context of the parcel map. According to County planning department employee Zachary Carter: "The Subdivision Map Act says there must be intent to merge. And with the crow's feet and the total acreage and the total area called as parcel two, I would have to say that would then be intent to merge." And former County planning department employee Arthur Pion testified: "Those we consider tie lines. And what the message is that the adjoiners are to be a part of the parcels that are shown. And so they tie, well, the adjoining parcels, and leave a message that was really what the final map was to look like."

*County of Santa Barbara, supra,* 7 Cal.4th at p. 731; accord, *Lakeview Meadows Ranch v. County of Santa Clara, supra,* 27 Cal.App.4th at p. 600; see Gov. Code, § 66451.10.) Prior to the Legislature's first adoption of merger provisions in 1976, there was no statutory authority for merger by operation of law through common ownership. (*Stell v. Jay Hales Development Co., supra,* 11 Cal.App.4th at pp. 1224–1225.)

### Involuntary Merger

The "concept of the involuntary merger of contiguous parcels in common ownership . . . originated with a 1973 opinion of the California Attorney General (56 Ops.Cal.Atty.Gen. 509 (1973)) . . . ." (*Gomes v. County of Mendocino, supra,* 37 Cal.App.4th at pp. 987–988, fn. omitted.) The Attorney General's opinion in turn relied on a decision of the California Supreme Court, *Hill v. City of Manhattan Beach* (1971) 6 Cal.3d 279 [98 Cal.Rptr. 785, 491 P.2d 369]. (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 753.) The Legislature responded to those authorities by enacting and later amending various parcel merger provisions. (*Gomes v. County of Mendocino, supra,* 37 Cal.App.4th at p. 988.) "All of that legislation begins with a general negation of automatic parcel merger by virtue of common ownership, followed by a delineation of particular circumstances and conditions under which merger *will* take place." (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 755.)

 The Act now provides a mechanism for involuntary mergers, which may be initiated by local governments under specified circumstances. For example, one provision permits the involuntary merger of parcels that were created in violation of subdivision laws and ordinances applicable at the time of their creation. (Gov. Code, § 66451.11, subd. (b)(2); *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 761.) Another provision permits local governments to compel involuntary mergers under specified circumstances when at least one of the parcels is substandard under the local zoning ordinance. (Gov. Code, § 66451.11, subd. (a); *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 757.)

Such involuntary mergers may be accomplished "only in accordance with the authority and procedures" prescribed in the Act. (Gov. Code, § 66451.10, subd. (b).) "Under the Act, a merger of parcels is initiated by recorded notice to the owner of an intention to determine status." (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 757; see Gov. Code, § 66451.12.) In addition to notice, another key safeguard under the statute is the opportunity to be heard. (*Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 757; see Gov. Code, § 66451.14.)

*Voluntary Merger*

Of course, a landowner may seek to voluntarily merge its parcels. (See, e.g., *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 751.) According to County, the merger effected by the 1970 parcel map was a voluntary one, initiated and accomplished by Weis on behalf of himself and his neighbors. For his part, van't Rood complains that the affected neighbors did not consent to the merger.

To the extent a landowner's voluntary merger application affects other property owners, their acknowledgement and consent is required. In the current version of the Subdivision Map Act, the consent requirement applies both to final maps and to parcel maps. According to the statute: "No final map or parcel map required by this chapter or local ordinance which creates a subdivision shall be filed with the local agency without the written consent of all parties having any record title interest in the real property proposed to be subdivided, except as otherwise provided in this division." (Gov. Code, § 66430.) This is the County's current local practice as well, according to testimony at trial.

In 1970, however, the consent requirement applied only to final maps. According to the statute then in place: "A certificate, signed and acknowledged by all parties having any record title interest in the land subdivided, consenting to the preparation and recordation of the final map is required." (Bus. & Prof. Code, former § 11589, added by Stats. 1943, ch. 128, § 1, p. 872; see also, Bus. & Prof. Code, former § 11625, added by Stats. 1943, ch. 128, § 1, p. 876 [requiring the subdivider to present evidence of consent as a prerequisite to recording final map].)

The County's position is that the 1970 parcel map is valid because it complied with the then current statutory requirements for consent. But as the County acknowledges, even absent statutory compulsion, there are constitutional due process requirements.

### C. Due Process

"Due process principles require reasonable notice and opportunity to be heard before governmental deprivation of a significant property interest. [Citations.]" (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612 [156 Cal.Rptr. 718, 596 P.2d 1134].) These requirements "are not rooted in statute but are compelled by the stronger force of constitutional principle." (*Id.* at p. 616.) Thus, "even though notice and hearing requirements for parcel maps are not specifically set forth in the Map Act, such constitutional prerequisites must be followed. [Citation.]" (Curtin & Merritt, Subdivision Map Act Manual, *supra,* p. 69, citing *Horn v. County of Ventura, supra,* 24 Cal.3d 605.)

"Land use decisions that affect property rights of adjacent landowners require procedural due process for the adjacent landowners as well as for the applicants. [Citation.]" (*Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 558 [35 Cal.Rptr.2d 782], fn. omitted, citing *Horn v. County of Ventura, supra,* 24 Cal.3d at pp. 615–616.) Thus, "whenever approval of a tentative subdivision map will constitute a substantial or significant deprivation of the property rights of other landowners, the affected persons are entitled to a reasonable notice and an opportunity to be heard before the approval occurs." (*Horn v. County of Ventura, supra,* 24 Cal.3d at p. 616.)

According to the County, "Weis had ample procedural due process in the parcel map process" and "the constitutionally sufficient notice and opportunity to be heard provided to Weis was imputed as a matter of law to [Pereira/Vargas] and Pacheco." That is so, the County asserts, because "[Pereira/Vargas] and Pacheco gave 'actual authority' to Weis as their agent to take whatever steps were necessary to complete the County's land division procedure, including filing the parcel map."

To evaluate that assertion, we consider whether the record supports the trial court's agency determination.

## II. *Agency*

We begin by setting forth the relevant principles of agency law. We then apply those principles to the undisputed facts of this case.

### A. *Legal Principles*

#### 1. *Definitions; Actual and Ostensible Agency*

"An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." (Civ. Code, § 2295.) "An agency is either actual or ostensible." (Civ. Code, § 2298.) "An agency is actual when the agent is really employed by the principal." (Civ. Code, § 2299.) "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.)

Here, the trial court made a finding that Weis was the actual agent of Pereira/Vargas and Pacheco; it did not find ostensible agency.[8]

---

[8] As the trial court explained in its statement of decision: "The court finds that WEIS was the actual agent of PACHECO and [PEREIRA/]VARGAS and that PACHECO and [PEREIRA/]VARGAS authorized WEIS to do what was reasonably necessary to obtain approval from the COUNTY OF SANTA CLARA to be able to convey the respective parcels

## 2. *Creation*

Actual agency typically arises by express agreement. (See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency & Employment, § 36, pp. 49–50; see also, e.g., *Naify v. Pacific Indemnity Co.* (1938) 11 Cal.2d 5, 12 [76 P.2d 663] [actual agency must rest on agreement or consent].) It also "may be implied from the conduct of the parties. [Citation.]" (*Thayer v. Pacific Elec. Ry. Co.* (1961) 55 Cal.2d 430, 438 [11 Cal.Rptr. 560, 360 P.2d 56].) Where the agreement to create an agency is express, it "may be oral, except where the agency is to enter into a contract required by law to be in writing, in which case the authorization must be in writing under the 'equal dignities rule.' [Citations.]" (2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 36, p. 50, italics omitted; see Civ. Code, § 2309.)

" 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' [Citation.] 'The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.' [Citation.]" (*Edwards v. Freeman* (1949) 34 Cal.2d 589, 592 [212 P.2d 883], quoting Restatement, Agency, § 1.) Thus, the "formation of an agency relationship is a bilateral matter. Words or conduct by both principal and agent are necessary to create the relationship . . . ." (*Hanks v. Carter & Higgins of Cal., Inc.* (1967) 250 Cal.App.2d 156, 163 [58 Cal.Rptr. 190].)

An actual agency also may be created by ratification. (Civ. Code, § 2307; see 2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 39, pp. 51–52.) But "ratification can be made only in the manner that would have been necessary to confer an original authority for the act ratified . . . ." (Civ. Code, § 2310.) Thus, where the equal dignities rule applies, it requires formal, written ratification. (*Ibid*; see generally, 2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 88, pp. 88–89.) Where a writing is not required, a principal may ratify an agency "by accepting or retaining the benefit of the act, with notice thereof." (Civ. Code, § 2310.) But "ratification is possible only when the person whose unauthorized act is to be accepted purported to act as agent for the ratifying party." (2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 39, p. 52, italics omitted.)

---

to them to increase their pasture land. Therefore, knowledge of the 1970 parcel map is imputed to PACHECO and [PEREIRA/]VARGAS as a matter of law."

The trial court previously made a tentative determination of ostensible agency, which it apparently abandoned after objection by van't Rood.

### 3. *Control*

"In the absence of the essential characteristic of the right of control, there is no true agency . . . ." (*Edwards v. Freeman, supra,* 34 Cal.2d at p. 592; see also, e.g., *Emery v. Visa Internat. Service Assn., supra,* 95 Cal.App.4th at p. 960 [no evidence "that VISA exercised a right to control the lottery merchants so as to create an agency by conduct"]; *St. Paul Ins. Co. v. Industrial Underwriters Ins. Co.* (1989) 214 Cal.App.3d 117, 123 [262 Cal.Rptr. 490] [insufficient evidence that automobile dealership had the right to control potential buyer during test drive].)

"The fact that parties had a preexisting relationship is not sufficient to make one party the agent for the other. . . . [Citation.] An agency is proved by evidence that the person for whom the work was performed had the right to control the activities of the alleged agent. [Citation.]" (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 983 [21 Cal.Rptr.2d 834]; see also, e.g., *Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 826 [106 Cal.Rptr.2d 689] [indicia of agency relationship include right to control].) By the same token, "[a] person does not become the agent of another simply by offering help or making a suggestion." (*Violette v. Shoup, supra,* 16 Cal.App.4th at p. 620.) Our high court long ago rejected the notion that "one who performs a mere favor for another, without being subject to any legal duty of service and without assenting to any right of control, can be an agent." (*Edwards v. Freeman, supra,* 34 Cal.2d at pp. 591–592.) "Control may not be inferred merely from the fact that one person's act benefits another. [Citation.]" (*St. Paul Ins. Co. v. Industrial Underwriters Ins. Co., supra,* 214 Cal.App.3d at p. 123.)

### 4. *Authority*

An actual agent may have either actual or ostensible authority to act for the principal. (See Civ. Code, § 2315; 2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 75, p. 79.) "Actual authority is such as a principal intentionally confers upon an agent, or intentionally or by want of ordinary care allows the agent to believe himself to possess. (Civ. Code, § 2316.) Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess. (Civ. Code, § 2317.) An agent will normally have the authority to do everything necessary or proper and usual in the ordinary course of business for effecting the purpose of his agency. (Civ. Code, § 2319.) Authority may be granted to an agent either by a precedent authorization or a subsequent ratification. (Civ. Code, § 2307.)" (*Ripani v. Liberty Loan Corp.* (1979) 95 Cal.App.3d 603, 611 [157 Cal.Rptr. 272].)

"[P]ersons dealing with an assumed agent are bound at their peril to ascertain the extent of the agent's authority. [Citation.]" (*Lindsay-Field v. Friendly* (1995) 36 Cal.App.4th 1728, 1734 [43 Cal.Rptr.2d 71]; see also *Ernst v. Searle* (1933) 218 Cal. 233, 240 [22 P.2d 715].) A principal cannot be held when an actual agent acts beyond the scope of his actual or ostensible authority. (*Ernst v. Searle, supra,* 218 Cal. at p. 238; cf., *Chartered Bank of London v. Chrysler Corp.* (1981) 115 Cal.App.3d 755, 763 [171 Cal.Rptr. 748] [purported agent had no actual or ostensible authority to sell boat until purchase price was paid]; see generally, 2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 78, pp. 80–81.)

Within the scope of his authority, "notice to an agent is notice to the principal . . . ." (*Watson v. Sutro* (1890) 86 Cal. 500, 516 [25 P. 64].) Thus, " 'one who acts through another will be presumed to know all that the agent learns during the transaction, whether it is actually communicated to him or not.' " (*Id.* at p. 517.) "There is no difference in this respect between actual and constructive notice." (*Shapiro v. Equitable Life Assur. Soc.* (1946) 76 Cal.App.2d 75, 87 [172 P.2d 725].) But the knowledge imputed to a principal is limited to that acquired by the agent within the scope of his authority. (*Triple A Management Co. v. Frisone* (1999) 69 Cal.App.4th 520, 535 [81 Cal.Rptr.2d 669]; *Redman v. Walters* (1979) 88 Cal.App.3d 448, 454 [152 Cal.Rptr. 42].) "Authority in a particular case is interpreted in accordance with the usual rules for interpretation of contracts. [Citations.]" (2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 79, p. 81, italics omitted.)

### 5. *Proof*

"Proof of an agency relationship may be established by 'evidence of the acts of the parties and their oral and written communications.' [Citations.]" (*Magnecomp Corp. v. Athene Co., supra,* 209 Cal.App.3d at p. 536.) Proof of authority, either actual or ostensible, likewise may be established by circumstantial evidence. (*Ripani v. Liberty Loan Corp., supra,* 95 Cal.App.3d at p. 611.)

### B. *Application*

Guided by these principles of agency law, we consider whether the evidentiary record supports the trial court's determinations.

### 1. *Trial Court's Agency Determinations*

On the question of the existence and nature of an agency relationship, the trial court determined that Weis was the actual (not ostensible) agent of

Pereira/Vargas and of Pacheco. With respect to the scope of Weis's authority, the court concluded that Weis had authority from Pereira/Vargas and from Pacheco to do whatever was "reasonably necessary" to obtain the County's approval so that they could purchase additional land from him.

### 2. *Proof*

The evidence of Weis's relationship with each of his neighbors is different. For that reason, we separately examine the evidence of agency and authority as it relates to each neighbor.

### a. *Pacheco*

The only evidence of an agency relationship between Weis and Pacheco is in their 1970 real estate sales contract, which provides that Weis is "to . . . complete lot split procedure." With Weis and Pacheco both dead, there was no testimony at trial concerning any oral communications between them. And apart from the contract itself, there is no evidence of any conduct by Pacheco indicating that he conferred any authority on Weis to deal with his property. The written contract thus stands alone as the only evidence of the existence and scope of any agency relationship between Weis and Pacheco.

For purposes of our analysis here, we assume (without deciding) that the parties' agreement that Weis would "complete [the] lot split procedure" created an actual agency, and we turn to the question of the scope of Weis's authority. We interpret the express authority granted by the parties' 1970 agreement by resort to the usual rules for contract interpretation. (2 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 79, p. 81.) Because no conflicting extrinsic evidence was admitted to explain the contract's meaning, its interpretation presents a question of law for our independent review. (*WYDA Associates v. Merner, supra,* 42 Cal.App.4th at p. 1710.)

First, we discern no factual basis for finding actual authority. (See Civ. Code, § 2316 ["Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess"].) In our view, nothing in the 1970 contract provision directing Weis to complete the "lot split procedure" can be construed as a grant of authority to effect a merger of Pacheco's preexisting parcels or to deal with those properties in any other fashion. (See *Ernst v. Searle, supra,* 218 Cal. at p. 240 [real estate agent, who had actual authority to negotiate a property exchange, did not have actual authority to convey the property]; *Mason v. Mazel* (1947) 82 Cal.App.2d 769, 773 [187 P.2d 98] [real estate agent, who had "exclusive right to sell" property, did not have actual authority to enter binding contract for sale].) Moreover, we find nothing in

that provision that would warrant Weis in believing he had such authority. (See *Mannion v. Campbell Soup Co.* (1966) 243 Cal.App.2d 317, 323 [52 Cal.Rptr. 246].) In short, there is no evidence of actual authority.

Second, we find no proof of ostensible authority. (See Civ. Code, § 2317 ["Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess"].) There is no evidence of conduct on Pacheco's part that would justify a belief on the County's part that Weis was authorized to merge or otherwise affect Pacheco's preexisting property. (See *Ernst v. Searle, supra,* 218 Cal. at p. 240 [real estate agent, who had actual authority to negotiate a property exchange, did not have ostensible authority to convey the property].)

In sum, even assuming an actual agency relationship between Weis and Pacheco, there is no evidence to support the trial court's conclusion that Weis's authority extended to land that Pacheco already owned.

### b. *Pereira/Vargas*

Unlike the Pacheco contract, Weis's 1970 real estate sales contract with Pereira/Vargas did not expressly provide that he would complete the lot split. Thus, there is no documentary evidence of an actual agency relationship.

The only proof of actual agency was the trial testimony of both Pereira and Vargas concerning oral communications between Weis and them. Vargas testified only to his understanding that Weis "would take care of the paperwork" for the land division.[9] Pereira testified that he never had a

---

[9] Vargas testified on direct examination as follows:

"Q: Did you enter into a contract to purchase this parcel, the three and a half acres, from Mr. Weis?

"A. Yes, we did.

"Q. Did Mr. Weis inform you that he was processing some sort of approval through the County of Santa Clara for that lot?

"A. Said he would take care of the paperwork.

"Q. Now, let me go back over that. Is that a quote that you just gave us, that he would take care of the paperwork?

"A. Well, we assumed he would take care of the paperwork. That was—

"Q. Did he describe to you what the paperwork was?

"A. No, he didn't, no."

Vargas then gave the following testimony on cross-examination:

"Q. During the time that Mr. Weis was working with the county for the property division, it's my understanding that you didn't have any involvement in any of that paperwork that Mr. Weis was working on; is that right?

"A. Correct.

"Q. And that was based on the agreement that Mr. Weis would take care of that paperwork?

conversation with Weis about his dealings with the County.[10] Nothing in the testimony of Pereira or Vargas suggests either that they assented to representation by Weis or that they had any right to control his activities with the County. ▆▆ Both assent and control are necessary predicates to establishing an actual agency relationship. (*Edwards v. Freeman, supra,* 34 Cal.2d at p. 591.)

In short, there is no evidence in the record to support a finding of actual agency between Weis and Pereira/Vargas.[11]

### 3. *Conclusion*

Weis lacked the authority to deal with land that Pacheco and Pereira/Vargas already owned. He thus lacked authority to bind them to the merger of their properties apparently effected by the 1970 parcel map.

Given Weis's lack of authority, the 1970 parcel map is not valid as voluntary merger. As explained above, the map likewise is not valid as an involuntary merger, because Pereira/Vargas and Pacheco were not afforded constitutionally required procedural safeguards.

### III. *Exclusion*

That brings us to the ultimate question to be resolved, whether petitioners met the statutory requirements for exclusion of their property from the 1970

---

"A. Right.

"Q. When you bought the property from Mr. Weis in 1970, it's accurate that you never had a discussion about whether it was going to be separate property or combined property specifically at the time; is that right?

"A. We were buying it as a separate parcel. I mean, no, there was never any discussion as far as combining or anything, no."

[10] Pereira testified on cross-examination as follows:

"Q: Mr. Pereira, when you agreed to buy the property, did you talk to Mr. Weis at all about going down to the county with him to do whatever was necessary to effect the property division?

"A: I don't think we ever had a conversation about going to the county for anything.

"Q: Did Mr. Weis ever mention to you that he was going down there to accomplish the land division that he needed to do to sell you the property?

"A: Never did talk about anything like that.

"Q: Was it your assumption that he would do whatever was necessary to sell off the property?

"A. Just took it for granted everything was fine. . . .

"Q. And did you trust Mr. Weis to do whatever was necessary to carry out the property transaction?

"A. I always though he was a real honest man."

[11] Because we conclude that the evidence does not support a finding of agency, we need not and do not reach the question of whether any such agency would require a writing under the " 'equal dignities rule.' " (Cf., *Clifton Cattle Co. v. Thompson* (1974) 43 Cal.App.3d 11, 17 [117 Cal.Rptr. 500].)

map. Those requirements are that "the petitioners produce to the court satisfactory evidence of the necessity of the exclusion of the real property" and "that there is no reasonable objection to making such exclusion." (Gov. Code, § 66499.25.) In this case, the trial court concluded that petitioners failed to meet either prong of the statutory requirements.

## A. *Necessity*

The court found no necessity to exclude, observing: "Petitioners have valid title to the property they purchased, and enjoy property ownership which is consistent with the legally filed and recorded 1970 parcel map."

We disagree. First, petitioners have asserted an impairment of their property rights. While it is true that they have title to the property they purchased in 1970, the parcel map stripped petitioners of the benefits of owning that land as a separate parcel; it also merged their preexisting properties, with the same effect—loss of potential development rights. (See, e.g., *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 833, fn. 2 [97 L.Ed.2d 677, 107 S.Ct. 3141] [right to develop property, subject to legitimate permitting requirements]; cf., *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 514, 518 [125 Cal.Rptr. 365, 542 P.2d 237] [recognizing potential diminution in value as a result of zoning, but rejecting argument that it constitutes an impermissible taking].) Second, the 1970 parcel is not valid. The map cannot legally effect either a voluntary merger (because of the lack of Weis's authority to bind his neighbors) or an involuntary merger (because of the lack of due process). Petitioners apparently have no other remedy for releasing their property from the operation of the invalid map, which has impaired their property rights.

We conclude that petitioners have demonstrated the requisite necessity for exclusion from the map.

## B. *No Reasonable Objection*

The trial court found the County's objections to exclusion reasonable, "because granting the petition for exclusion would be in violation of the current zoning regulations and in violation of the 1970 parcel map." The court also cited the County's general authority to control orderly development, adding: "To rule in favor of petitioners would be disruptive of the entirety of the zoning plan that the community has enacted."

Again, we disagree. First, the fact that granting the petition for exclusion would violate the 1970 parcel map is not a reasonable basis for objection, given our determination that the map is invalid to the extent it

purports to merge petitioners' properties. We also observe that whenever relief is granted under this statute, it necessarily will be "in violation" of the map from which exclusion is sought. Second, as to the zoning issue, we acknowledge that orderly community development is an important goal of the Subdivision Map Act. (See, e.g., Curtin & Merritt, Subdivision Map Act Manual, *supra*, p. 1.) But the protection of individual real estate buyers, such as petitioners, is another important statutory goal. (*Ibid.*) ▪ More importantly, the impact on zoning and community development must be measured against the ordinances, standards, and policies in effect at time of the land division, rather than against current regulations and standards. (Cf., Gov. Code, § 66474.2, subd. (a) [only existing policies apply to tentative map approvals]; *Bright Development v. City of Tracy* (1993) 20 Cal.App.4th 783, 800 [24 Cal.Rptr.2d 618] [city could not apply policy that was not in effect at the time tentative map application was deemed complete]; *Robertson v. Nichols* (1949) 92 Cal.App.2d 201, 205 [206 P.2d 898] [validity of restrictions assessed in light of conditions at the time they were imposed].) The zoning at the time of the 1970 land division was one-acre minimum. Changes in zoning since that time do not constitute a reasonable basis for objection to exclusion.

Under the circumstances presented here, and on this record, there is no reasonable objection to exclusion.

## CONCLUSION

The 1970 parcel is invalid to the extent it purports to merge properties belonging to petitioners. The map cannot legally effect a voluntary merger, because Weis lacked authority to bind his neighbors. It cannot legally effect an involuntary merger, because of the lack of due process afforded Pereira/Vargas and Pacheco.

Given the map's invalidity and the other circumstances of this case, this record demonstrates both the requisite necessity for exclusion from the map and the lack of any reasonable objection.

## DISPOSITION

We reverse the judgment and remand the matter to the trial court with instructions to grant the petition to exclude the petitioners' properties from the 1970 parcel map. This decision applies to Pereira and Vargas as well as van't Rood, notwithstanding the fact that they did not join in appealing the judgment. (*Estate of McDill* (1975) 14 Cal.3d 831, 841 [122 Cal. Rptr. 754, 537 P.2d 874].) Appellant, van't Rood, shall have his costs on appeal.

Premo, Acting P. J., and Elia, J., concurred.